1  Bingham McCutchen LLP
   SUSAN L. HOFFMAN (SBN 90496)
2  susan.hoffman@bingham.com
   KAREN J. PAZZANI (SBN 252133)
3  karen.pazzani@bingham.com
   355 South Grand Avenue, Suite 4400
4  Los Angeles, CA 90071-3106
   Telephone: 213.680.6454
5  Facsimile: 213.680.6499

6  FRANCES S. COHEN (BBO 542811)
   frances.cohen@bingham.com
7  JOSEPHINE DEANG (BBO 669469)
   josephine.deang@bingham.com
8  One Federal Street
   Boston, MA 02110-1726
9  Telephone: 617.951.8872
   Facsimile: 617.951.8736

10

11 Attorneys for Defendant
   Massachusetts Financial Services Company

12

13

14                 **UNITED STATES DISTRICT COURT**

15                 **CENTRAL DISTRICT OF CALIFORNIA**

16                      **WESTERN DIVISION**

17

18 | IATSE LOCAL 33 SECTION 401(k) | Case No. CV 08-03949 AHM
   | PLAN BOARD OF TRUSTEES,        |

19               Plaintiff,            **MEMORANDUM OF POINTS
                                       AND AUTHORITIES IN
20       v.                            SUPPORT OF MOTION TO
                                       DISMISS OF
21 MICHAEL L. BULLOCK, individually    MASSACHUSETTS
   and doing business as INNOVATIVE    FINANCIAL SERVICES
22 EMPLOYEE BENEFITS PROGRAMS;         COMPANY
   SECURITIES AMERICA, INC.;
23 MASSACHUSETTS FINANCIAL             Date:      September 22, 2008
   SERVICES COMPANY,                   Time:      10:00 a.m.
24                                     Courtroom: 14
              Defendants.              Judge:     Hon. A. Howard Matz
25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   THE ALLEGATIONS OF THE COMPLAINT ............................................ 3

III.  ARGUMENT .................................................................................... 6

      A.    The ERISA Claims Must Be Dismissed As To MFS ......................... 6

            1.    The Statutory Scheme ................................................ 8

            2.    MFS Falls Squarely within ERISA's Express Provisions
                  Establishing the Non-Fiduciary Status of Investment
                  Advisers to Mutual Funds, and No Factual Allegations
                  Support that MFS Undertook any Other Fiduciary
                  Functions .............................................................. 10

            3.    Even If MFS Were a Fiduciary, It Did Not Breach any
                  Duty by Making Undisclosed Payments from Plan
                  Assets, Because, on the Face of the Complaint, the
                  Alleged Payments Were Not from "Plan Assets" ............ 14

      B.    ERISA Preempts The State Law Claims Under The California
            Business And Professions Code Section 17200 et seq. ............... 15

            1.    ERISA Preempts Claims Under State Consumer
                  Protection And Unfair Business Practice Laws, Including
                  Section 17200 ........................................................ 16

            2.    Section 17200 Does Not Apply to Securities Transactions .... 17

            3.    Plaintiff's Section 17200 Claims are Barred by the
                  Statute of Limitations .............................................. 18

            4.    Plaintiff Does Not Have Standing To Bring Their Section
                  17200 Claims ......................................................... 19

IV.   CONCLUSION .............................................................................. 20

/72624041.2/0328316-0000333931

# TABLE OF AUTHORITIES

## FEDERAL CASES

Acosta v. Pacific Enterprises,
  950 F.2d 611 (9th Cir. 1992) ................................................................. 8

Aetna Health Inc. v. Davila,
  542 U.S. 200 (2004) ........................................................................... 16

Arizona State Carpenters Pension Trust Fund v. Citibank,
  125 F.3d 715 (9th Cir. 1997) ............................................................... 13

Branch v. Tunnell,
  14 F.3d 449 (9th Cir. 1994) ................................................................. 3

Chavez v. Blue Sky Natural Beverage Co.,
  503 F. Supp. 2d 1370 (N.D. Cal 2007) ................................................. 19

Clegg v. Cult Awareness Network,
  18 F.3d 752 (9th Cir. 1994) ................................................................. 6

Cleghorn v. Blue Shield of California,
  408 F.3d 1222 (9th Cir. 2005) ............................................................. 16

Dishman v. UNUM Life Ins. Co.,
  269 F.3d 974 (9th Cir. 2001) ............................................................... 16

Elliot v. Fortis Benefits Ins. Co.,
  337 F.3d 1138 (9th Cir. 2003) ............................................................. 16

Hecker v. Deere & Company,
  496 F. Supp. 2d 967 (W.D. Wis. 2007),
  appeal docketed, No. 07-1624 (7th Cir. Oct. 26, 2007) ..................... 12, 14

Karl Storz Endoscopy America, Inc. v. Surgical Technologies, Inc.,
  285 F.3d 848 (9th Cir. 2002) ............................................................... 18

Mertens v. Hewitt Associates,
  508 U.S. 248 (1993) ............................................................................. 8

Pilot Life Ins. Co. v. Dedeaux,
  481 U.S. 41 (1987) ......................................................................... 7, 16

Sackett v. Beaman,
  399 F.2d 884 (9th Cir. 1968) ............................................................... 19

Taylor v. United Technologies Corporation,
  2007 WL 2302284 (D. Conn. Aug. 9, 2007) ......................................... 14

Torres v. Bella Vista Hosp., Inc.,
  523 F. Supp. 2d 123 (D.P.R. 2007) ....................................................... 8

Wyler Summit Partnership v. Turner Broadcasting System, Inc.,
  135 F.3d 658 (9th Cir. 1998) ................................................................. 6

**STATE CASES**

Animal Legal Defense Fund v. Mendes,
    160 Cal. App. 4th 136 (2008).............................................................19

Bowen v. Ziasun Technologies, Inc.,
    116 Cal. App. 4th 777 (2004)........................................................17, 18

Hall v. Time, Inc.,
    158 Cal. App. 4th 847 (2008)............................................................19

Norgart v. Upjohn Co.,
    21 Cal. 4th 383 (1999).....................................................................18

Overstock.com, Inc. v. Gradient Analytics, Inc.,
    151 Cal. App. 4th 688 (2007).............................................................18

Snapp & Associates Ins. Services v. Malcolm Bruce Burlingame Robertson,
    96 Cal. App. 4th 884 (2002)........................................................18, 19

**STATUTES**

29 C.F.R. § 2509.75-8 D-2 ....................................................................13

15 U.S.C. §§ 80b-2, 80b-15 ...................................................................3, 4

California Business and Professions Code §§ 17200 *et seq*............15, 16, 17, 18, 19

ERISA § 406(a), 29 U.S.C. § 1106(a) .........................................................17

ERISA § 3(21)-(iii), 29 U.S.C. § 1002(21) .........................................8, 9, 10, 12, 13

ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1) .........................................7, 10, 12, 14

ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).........................................8, 10

ERISA § 514(a), 29 U.S.C. § 1144(a) .........................................................16

ERISA § 502, 28 U.S.C. § 1132.........................................7, 8, 9, 16, 17

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.) .........................................9

Defendant Massachusetts Financial Services Company ("MFS") submits this memorandum in support of its motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) because the Complaint fails to state a claim against MFS upon which relief can be granted.

## I.   INTRODUCTION

Plaintiff IATSE Local 33 Section 401(k) Plan Board of Trustees (the "Plan") filed this lawsuit against its former broker and adviser Michael L. Bullock (individually and d/b/a Innovative Employee Benefits Programs) (collectively, "Bullock"); the brokerage firm with which Mr. Bullock was previously affiliated, Securities America, Inc. ("SAI"); and MFS, which is affiliated with neither.  The Complaint alleges that Bullock was hired by the Plan for a fee to provide investment advice and brokerage services through SAI.   MFS, a registered investment adviser that manages mutual fund assets, appears to have been added to this Complaint because "[o]ne investment that SAI and Bullock advised the Plan to maintain and invest in was a mutual fund operated by MFS." Compl. ¶ 17.  The Complaint asserts eight counts against all defendants, without differentiation, under the Employee Retirement Income Security Act of 1974 ("ERISA") (Counts I – V) and California state law (Counts VI – VIII).

The gravamen of the Complaint appears to be that, when Bullock recommended that the Plan include MFS mutual funds as investment options for Plan participants to choose, the Plan was not informed that Bullock indirectly received sales-based compensation "from money invested in MFS funds" (*id.* ¶ 32), through a lawful industrywide practice called "direct[ed] brokerage." The Complaint alleges that MFS acted unlawfully because (*i*) it was a "fiduciary" to the Plan under ERISA and thus should have informed the Plan of the payments at issue because (*ii*) those payments were made from "plan assets."  Specifically, the ERISA claims against MFS proceed on the theory that (*i*) MFS, by virtue of managing mutual funds that the Plan invested in, became a "fiduciary" to the Plan

1   under ERISA, and that (*ii*) payments "from money invested in MFS funds"

2   constituted payments from "plan assets." Each of the ERISA claims is predicated

3   on these twin assumptions; however, as a matter of express statutory law, both of

4   these assumptions are unambiguously wrong.

5       The Complaint wholly disregards ERISA provisions that provide (*i*) that an

6   investment adviser like MFS is *not* a fiduciary to a plan simply by virtue of

7   managing a mutual fund that a retirement plan invests in, and *(ii)* that assets of

8   mutual funds are *not* "plan assets" and thus "payments from money invested in

9   MFS funds" are not payments from plan assets. These express statutory provisions

10   for mutual funds and their advisers were meant to bar exactly the type of lawsuit

11   that Plaintiff now brings, and each carve-out provides an independent basis for

12   dismissing each of the ERISA claims.

13       Nor can Plaintiff use the California Code counts to breathe life into a lawsuit

14   that is both governed under, and prohibited by, ERISA. The state law claims that

15   Plaintiff asserts are wholly preempted by ERISA. Even if they were not, however,

16   they should be dismissed as a matter of law on the grounds that: 1) Section 17200

17   does not apply to securities transactions; 2) the claims alleged are barred by the

18   applicable four-year statute of limitations; and 3) the Plan has failed to allege that

19   it suffered any loss of money or property as a result of MFS's actions within the

20   meaning of Section 17200. Accordingly, MFS asks this Court to dismiss all counts

21   of the Complaint against MFS with prejudice.

22

23

24

25

26

27

28

## II.  THE ALLEGATIONS OF THE COMPLAINT[1]

The Plan, a participant-directed employee benefits pension plan, allegedly hired Bullock, a securities broker, "to provide objective, unbiased investment advice" for a fee. Compl. ¶ 7. According to the Complaint, Bullock provided investment advice and investment consultation to the Plan, regularly met with and advised the IATSE trustees regarding plan investments, and communicated with the Plan on a "day-to-day basis." *See id.* ¶¶ 7, 10, 13, 15, 16 and 36(e). Bullock's investment advice served as the "primary basis" for investment decisions "with respect to Plan assets." *Id.* ¶ 10.

Bullock and his affiliated broker-dealer, SAI, the Complaint alleges, advised the Plan regarding an appropriate menu of investment options to make available to Plan participants. *Id.* ¶ 14. "[B]ased upon information and advice provided by Bullock and SAI", the Plan Trustees "selected the MFS mutual fund as an option" for plan participants. *Id.* ¶ 9; *see id.* ¶¶ 14, 17, 31.

MFS, as the Complaint alleges, is a registered investment adviser, and acts as the investment adviser to the MFS mutual funds.[2] Unlike the other defendants,

---

[1] The facts stated are taken exclusively from the allegations of the Complaint, with one exception. Because the Complaint is based in part on MFS's supposed recordkeeping services to the Plan (*see, e.g.,* Compl. ¶ 18), MFS has attached hereto, and cites, the Recordkeeping Agreement between a *former affiliate* of MFS and the Plan. *See* Ex. A. This Court may consider this agreement in connection with this motion to dismiss. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) ("documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss").

[2] The Complaint alleges loosely that MFS "owns and operates various mutual funds." Compl. ¶ 9. Those allegations make little sense under the highly regulated scheme established by the Investment Company and Investment Advisers Acts of 1940. Under those statutes, MFS is an affiliate of the MFS mutual funds and provides investment advice to them under an investment advisory contract. *See* Investment Company Act, Sections 2(a)(3) and 15, 15 U.S.C. §§ 80b-2 and 80b-15. An investment adviser like MFS does not "own" the mutual funds that it advises. Furthermore, the MFS funds operate under the general supervision and direction of boards of trustees, consisting in major part of persons who are independent of MFS, not MFS.

(Footnote Continued on Next Page.)

1   MFS is not alleged to have had any contractual relationship with the Plan or its

2   trustees.   Rather, MFS is alleged to have had an advisory relationship with the

3   mutual fund *in which the Plan participants invested* by purchasing shares. *See,*

4   *e.g., id.* ¶ 14 (Plan investment options included "a mutual fund operated by MFS");

5   *id.* ¶ 18 ("Plan participants were offered the opportunity to invest in MFS mutual

6   funds").  Incorrectly equating management of the MFS mutual funds that the Plan

7   participants purchased shares of with management of "plan assets" (a term of legal

8   significance), the Complaint pleads the legal conclusion that MFS was a

9   "fiduciary" to the Plan "by reason of providing services to the Plan, and by making

10   discretionary decisions relating to the purchase and sale of stock, bonds, and other

11   investment vehicles owned by the Plan". *Id.* ¶ 9.  This allegation merely describes

12   MFS's role as investment adviser to the MFS mutual funds, not any direct advisory

13   relationship between MFS and the Plan.

14        In fact, the only services that MFS is alleged to have provided directly to the

15   Plan are "record keeping services." *See id.* ¶ 18.  However, those recordkeeping

16   services were not provided by MFS at all, but rather by a separate non-party entity

17   (a former subsidiary of MFS), although the Complaint mistakes that entity for

18   MFS. *Compare id.* ¶ 18 *with* Ex. A, the Recordkeeping Agreement.  In any case,

19   the Recordkeeping Agreement, signed by the Plan, was limited to "ministerial"

20   tasks and expressly excluded any fiduciary functions. *See* Ex. A at 2, 5.

21   Apart from the incorrect allegation that MFS provided "record keeping services" to

22   the Plan, and the vague allegations that appear to describe MFS's investment

23   advisory relationship with MFS mutual funds *that the Plan participants invested in*

24   *by purchasing shares*, the Complaint alleges no *facts* about any "services" that

25   MFS provided directly to the Plan.

26   _____

    (Footnote Continued from Previous Page.)

27

28

4

1    Unable to plead any facts supporting a direct relationship between MFS and
2    the Plan, the Complaint focuses instead on MFS's alleged relationship with Bullock
3    and SAI, who allegedly had a direct relationship with the Plan.   The core
4    allegations of the Complaint in this regard focus on two purported arrangements
5    whereby SAI and Bullock, who were hired by the Plan to provide independent
6    objective advice, received certain compensation "from money invested in MFS
7    funds" that, allegedly, was not disclosed to the Plan.   *See* Compl. ¶¶ 19, 28-32.
8    Both involved a practice referred to in the Complaint as "direct[ing] brokerage
9    commissions on MFS portfolio transactions".   Although the Complaint does not
10   define "direct[ing] brokerage commissions," the Complaint likely refers to the
11   practice, formerly widespread in the mutual fund industry, of allocating brokerage
12   services for trades of mutual fund portfolio securities (resulting in commission
13   payments) to certain brokerage firms in recognition of mutual fund sales.   Until
14   2004, that practice, frequently referred to as "revenue sharing", was expressly
15   permitted by NASD Rule 2830(k), provided that the other requirements of the rule
16   were observed.   Notably, the practice of "directing brokerage" involves arranging
17   for brokerage services resulting in the payment of brokerage commissions out of
18   the assets of a mutual fund; it does not involve the payment of any fees,
19   commissions or monies directly from the assets of any particular mutual fund
20   shareholder (including the Plan in this case).[3]

21   In the first directed brokerage arrangement, Bullock is alleged to have
22   negotiated an agreement with MFS under which brokerage services required to
23   invest and reinvest MFS funds' portfolios and generating commissions would be
24   directed to SAI for Bullock's benefit.   Compl. ¶ 19.   In the second, SAI agreed to

---

[3] The Complaint acknowledges as much (*see* Compl. ¶ 32) (payments made from "monies invested in MFS mutual funds"), but fails to recognize the legal distinction between mutual fund assets (*i.e.*, the monies invested in the funds) and the shareholder's asset (*i.e.*, a share of the mutual fund).

1  promote the sale or retention of MFS funds to plans in exchange for such directed

2  brokerage.   *Id.* ¶ 32.   Both of these alleged arrangements involve MFS's

3  relationship with SAI and Bullock, *not* any MFS relationship with the Plan.   In any

4  event, as the Complaint alleges, both arrangements came to an end in November

5  2003, when MFS suspended its practice of directing brokerage services. *Id.* ¶ 25.

6  **III.   ARGUMENT**

7       As a general rule, on a motion to dismiss, the allegations of the Complaint

8  must be accepted as true and are to be construed in the light most favorable to the

9  nonmoving party, *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*,

10  135 F.3d 658, 661 (9th Cir. 1998).   However, this Court, plainly, "is not required

11  to  accept  legal  conclusions  cast  in  the  form  of  factual  allegations  if  those

12  conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult*

13  *Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

14       **A.   The ERISA Claims Must Be Dismissed As To MFS**

15       Counts I through III of the Complaint are brought under ERISA Section

16  502(a), and seek relief for MFS's alleged "breach of fiduciary duty" to the Plan.

17  Each count is premised on the conclusion that MFS was a "fiduciary" to the Plan

18  under ERISA.   Likewise, although Counts I through III make no attempt to

19  differentiate  between  the  very  dissimilarly-situated  named  defendants,  other

20  portions of the Complaint make clear that the basis for the allegation that MFS

21  breached its fiduciary duty is that it allegedly used "plan assets" to pay undisclosed

22  compensation to SAI and Bullock. *See* Compl. ¶ 32 ("These charges were paid

23  directly from money invested in MFS funds, and was therefore paid by the Plan

24  participants, and, therefore, from Plan assets."); *see also id.* ¶¶ 53, 58-60, 70, 76,

25  78.

26       Counts I through III must be dismissed for two adequate and independent

27  reasons:  First, under ERISA, MFS as a matter of law is *not* a fiduciary to the Plan

28

1  solely by virtue of managing assets of a mutual fund in which the Plan participants

2  invested, and there are no pleaded factual allegations (nor could there be) that MFS

3  undertook any other role with respect to the Plan that would create a fiduciary

4  relationship.  Second, the allegation that the payments for which MFS was sued

5  were payments from "plan assets" is also flatly contrary to the law.  *Compare id.*

6  ¶ 32 (alleging that the payments from "money invested in MFS funds" constituted

7  payments from "plan assets") *with* ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1)

8  (stating that, where, as here, a plan invests in a mutual fund, plan assets "shall not

9  . . . be deemed to include" the mutual fund's assets).

10      Counts IV and V of the Complaint, asserted under ERISA Section 406,

11  ERISA's "prohibited transactions" provisions, are premised on the same allegations

12  as the Section 502(a) claims and suffer the same legal defects.    Specifically,

13  Counts IV and V each are based on the allegation that MFS was a "fiduciary" to

14  the Plan (*see* Compl. ¶¶ 76, 78) and caused the Plan to engage in a prohibited

15  transaction.    The asserted prohibited transaction appears to be the alleged

16  "use . . . of Plan assets" for MFS's own benefit.  *Id.*    These claims must be

17  dismissed, as a threshold matter, because ERISA ***does not permit*** claims to be

18  brought directly under Section 406; ERISA Section 502(a) is the exclusive civil

19  remedy for alleging violations of ERISA.  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S.

20  41, 53-54 (1987); *see* ERISA § 502; 29 U.S.C. § 1132.[4]    Even had Plaintiff

21  properly pled these claims under one of the provisions of ERISA Section 502(a) on

22  a prohibited transaction theory, however, they would fail for the same two

23  independent reasons as Counts I through III: MFS is not a fiduciary to the Plan,

24

25  [4] Plaintiff's failure to plead under Section 502 cannot be overlooked.  Different

26  provisions of Section 502 offer very specific remedies, and plaintiff's impermissible "direct" claims under Section 406 neither adhere to the specific

27  limitations of Section 502, nor do they put defendants on notice of the claims against them.

28

1  and the payments for which MFS is being sued did not constitute a misuse of "plan

2  assets" because they did not involve plan assets at all.

3    **1.    The Statutory Scheme**

4       ERISA permits suits for "breach of fiduciary duty" only against persons who

5  act as a "fiduciary" with respect to a plan or trust covered by ERISA.  *See e.g.,*

6  *Acosta v. Pacific Enterprises,* 950 F.2d 611, 617 (9th Cir. 1992).  Fiduciary status

7  may attach to those persons or entities that are "named fiduciaries" under ERISA

8  Section 402(a)(2); *i.e.,* those persons or entities that are either identified in the plan

9  documents as having responsibility for the operation of the plan or "who, pursuant

10 to a procedure specified in the plan, [are] identified as a fiduciary (A) by a person

11 who is an employer or employee organization with respect to the plan or (B) by

12 such an employer and such an employee organization acting jointly."  ERISA §

13 402(a)(2), 29 U.S.C. § 1102(a)(2); *Torres v. Bella Vista Hosp., Inc.,* 523 F. Supp.

14 2d 123, 135 (D.P.R. 2007).  In addition, ERISA Section 3(21)(A) provides that a

15 person or entity can be a fiduciary under three other limited circumstances.

16 *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993); *see* ERISA § 3(21)(A)29,

17 U.S.C. § 1002(21)(A).  Fiduciary status can arise where a person: (i) exercises any

18 discretionary authority or discretionary control respecting management of such

19 plan or exercises any authority or control respecting management of the plan or

20 disposition of its assets; (ii) renders investment advice for a fee or other

21 compensation, direct or indirect, with respect to any monies or other property of

22 such plan; or (iii) has any discretionary authority or discretionary responsibility in

23 the administration of such plan.    ERISA § 3(21)(A)(i)-(iii), 29 U.S.C.

24 § 1002(21)(A)(i)-(iii); *See* Compl. ¶ 41.

25    Of critical importance, the statute expressly addresses mutual fund advisers,

26 such as MFS under this definition of fiduciary.  *See* ERISA § 3(21)(B), 29 U.S.C.

27 § 1002(21)(B).    Under this provision of ERISA, investment by an employee

28

8

1    benefit plan in a mutual fund (*i.e.*, an "investment company") does not "by itself

2    cause such investment company or such investment company's investment adviser

3    or principal underwriter to be a fiduciary or party in interest", except where the

4    investment adviser acts in connection with its own employee benefit plan.[5]  *See*

5    ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B).  Congress deliberately carved mutual

6    funds and their advisers out of ERISA's fiduciary and party in interest definitions

7    because additional regulation under ERISA was considered unnecessary in light of

8    the stringent regulation already applicable to investment companies.

9          Since mutual funds are regulated by the Investment

10          Company Act of 1940 and, since (under the Internal

11          Revenue Code) mutual funds must be broadly held, it is

12          not considered necessary to apply the [ERISA] fiduciary

13          rules to mutual funds merely because plans invest in their

14          shares.

15    H.R. Rep. No. 93-1280, at 296 (1974) (Conf. Rep.).

16

17       Moreover, consistent with ERISA's mandate that an investment adviser to a

18 ─────────────────

19    [5] The Section provides, in pertinent part:

20          If any money or other property of an employee benefit
          plan is invested in securities issued by an investment

21          company registered under the Investment Company Act
          of 1940 [15 U.S.C.A § 80A-1 *et seq.*], such investment

22          shall not by itself cause such investment company or
          such investment company's investment adviser or

23          principal underwriter to be deemed to be a fiduciary or a
          party in interest as those terms are defined in this

24          subchapter, expect insofar as such investment company
          or its investment adviser or principal underwriter acts in

25          connection with an employee benefit plan covering
          employees of the investment company, the investment

26          adviser, or its principal underwriter.

27    ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B).

28

1   mutual fund does not act as an ERISA plan fiduciary, the statute further makes
2   clear that the mere exercise of authority or control by a mutual fund adviser over
3   the assets of a mutual fund in which a plan participants purchases shares does not
4   mean that such adviser has authority or control with respect to the disposition of
5   plan assets.   Thus, the statute provides that when a plan invests in shares of a
6   mutual fund, the assets of the plan include *shares* in a mutual fund, but *they do not*
7   *include the assets -- i.e.*, the underlying investments -- *held by the mutual fund*:

> [i]n the case of a plan which invests in any security
> issued by an investment company registered under the
> Investment Company Act of 1940, the assets of such plan
> shall be deemed to include such security but shall not,
> solely by reason of such investment, be deemed to
> include any assets of such investment company.

15   ERISA § 401(b)(1), 29 U.S.C.§ 1101(b)(1).

         2.   **MFS Falls Squarely within ERISA's Express Provisions
              Establishing the Non-Fiduciary Status of Investment
              Advisers to Mutual Funds, and No Factual Allegations
              Support that MFS Undertook any Other Fiduciary
              Functions**

20   Each of Counts I through V is based on the allegation that MFS is
21   "fiduciary" to the Plan under ERISA *see, e.g.*, Compl. ¶¶ 52, 58, 76, 78, and the
22   existence of that alleged fiduciary relationship between the Plan and MFS is a legal
23   prerequisite to each of Plaintiff's claims.   However, because MFS is not a
24   "fiduciary" to the Plan within the meaning of ERISA, each of Counts I through V
25   must be dismissed.

26   Measured against the statutory scheme described above, the Complaint fails
27   to allege any basis on which this Court could conclude that MFS is a fiduciary to
28   the  Plan.  As an initial matter, MFS is certainly not a "named fiduciary" under

1   ERISA Section 402(a)(2), 29 U.S.C. § 1102(a)(2). The Complaint does not allege

2   that MFS is named as a fiduciary in any Plan documents, or that it was identified as

3   a fiduciary in any plan-specified procedures. Thus, there is no allegation to

4   support a conclusion that MFS is a fiduciary under ERISA Section 402(a)(2).

5          Nor are the allegations of the Complaint sufficient to support a claim that

6   MFS is a fiduciary under Section 3(21)(A) of ERISA. First, the Plan does not

7   allege any facts indicating that MFS "exercise[d] any discretionary authority or

8   discretion, any control respecting management of the plan or disposition of [the

9   Plan's] assets." *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). The most

10   that Plaintiff can muster is a lone, unsupported assertion that MFS "ma[de]

11   discretionary decisions relating to the purchase and sale of stock, bonds, and other

12   investment vehicles owned by the Plan." *See* Compl. ¶ 9. This allegation is not

13   only fatally vague and conclusory, but – most significantly – it runs headlong into

14   the ERISA provisions that make clear that MFS (a mutual fund adviser) is not a

15   fiduciary to the Plan as a matter of law.

16          The Complaint nowhere alleges (nor could it) that MFS and the Plan had a

17   direct investment advisory relationship. There is no mention, for example, of an

18   advisory contract between the Plan and MFS (because one does not exist). Rather,

19   it is clear from the Complaint that MFS is being sued in its capacity as an adviser

20   to the MFS mutual funds. Consistent with this, the Complaint specifically alleges

21   that SAI and Bullock, and not MFS, advised the Plan regarding its investments,

22   and that the MFS Funds merely happened to be one such investment choice:

23   • "The Trustees selected the MFS mutual fund as an option based upon

24       information and advice provided by <u>Bullock and SAI</u>. The Trustees

25       continued to maintain MFS as a mutual fund option based upon the advice

26       and consultation of <u>SAI and Bullock</u>." (Compl. ¶ 9) (emphasis added).

27
28   • "One of the investment services <u>SAI and Bullock</u> provided was to advise the

11

Plan regarding an appropriate menu of investment options to the Trustees. At least one the investment options promoted by SAI and Bullock and which was offered as an investment option by the Trustees for Plan participants was a mutual fund operated by MFS." (*Id.* ¶ 14) (emphasis added).

- "One investment that SAI and Bullock advised the Plan to maintain and invest in was a mutual fund operated by MFS." (*Id.* ¶ 17) (emphasis added).

- "Bullock and SAI regularly advised the Plan to maintain MFS funds in their investment menu or to add MFS to their investment menu." (*Id.* ¶ 31) (emphasis added).

Since it is apparent that the lone "fiduciary" allegation in the Complaint is based on the investment adviser relationship between MFS and the MFS funds (of which the Plan was merely a shareholder), the allegation fails to establish fiduciary status as a matter of law. MFS, as adviser to the mutual fund and not to the Plan, was not a fiduciary to the Plan under the express carve-out for mutual fund advisers in ERISA Section 3(21)(B). *See, e.g., Hecker v. Deere & Company*, 496 F. Supp. 2d 967, 976-77, (W.D. Wis. 2007), *appeal docketed*, No. 07-1624 (7th Cir. Oct. 26, 2007) (dismissing mutual fund investment adviser Fidelity Management & Research Company because it did not have "fiduciary responsibility for making plan disclosures or selecting plan investments.").

Moreover, as ERISA's carve-out makes abundantly clear, MFS as a mutual fund adviser had no discretionary control with respect to the assets of the Plan, but only as to the assets of the MFS mutual funds.[6] *See* ERISA § 401(b)(1), 29 U.S.C.

[6] The Complaint does not allege, nor could it, that MFS exercised control over any asset other than the assets of the mutual funds in which the Plan purchased shares. It is plain from the Complaint that when plaintiff alleges in paragraph 9 that MFS made "discretionary decisions relating to the purchase and sale of stocks, bonds, and other investment vehicles," it is referring to MFS's investment decisions as

(Footnote Continued on Next Page.)

§ 1101(b)(1). This failure to allege discretionary authority or control over investments is fatal to a breach of fiduciary duty claim against a mutual fund adviser. Therefore, MFS did not become a fiduciary under the first prong of ERISA Section 3(21)(A)(i).

Second, the Plan does not allege that MFS provided investment advice to the Plan for a fee within the meaning of the second prong, ERISA Section 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii). Nor could it. MFS's advisory clients were the mutual funds – investment companies within the parlance of the '40 Act – and not the Plan itself.

Third, the Plan has not alleged any facts showing that MFS "has any discretionary authority or discretionary responsibility in the administration of such plan," the third prong of ERISA Section 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). Rather, the only services allegedly performed by MFS for the Plan are "record keeping services." *See* Compl. ¶ 18. However, those services were not provided by MFS at all, but by a separate nonparty entity (a former subsidiary of MFS). *See* Ex. A. Moreover, even if MFS were the recordkeeping entity (which it was not), the performance by a party of ministerial tasks, such as recordkeeping, does not render such party a plan "fiduciary" under ERISA. *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 721-22 (9th Cir. 1997) (a "person or entity who performs only ministerial services or administrative functions within a framework of policies, rules, and procedures

(Footnote Continued from Previous Page.)

investment adviser *to the mutual funds* of which plan participants purchased shares. *See* Compl. ¶ 9 (Plan offered "MFS as a mutual fund option"); *id.* ¶ 14 ("an investment option . . . was a mutual fund operated by MFS"); *id.* ¶ 17 (same); ¶ 18 ("Plan participants were offered the opportunity to invest in MFS mutual funds"); ¶ 31 ("MFS funds [maintained] on investment menu"); ¶ 32 (articulating the Complaint's conclusion that the assets in "MFS funds" are "Plan assets"). The Complaint's allegation that mutual fund assets are plan assets is a mistaken legal conclusion not entitled to deference on a motion to dismiss.

1    established by others is not an ERISA fiduciary"); *see also* United States

2    Department of Labor Regulations at 29 C.F.R. § 2509.75-8 D-2 (a person who

3    performs purely ministerial functions within a framework of policies,

4    interpretations, rules, practices and procedures made by other persons is not a

5    fiduciary because such person does not have or exercise any discretionary authority

6    or control regarding the management of the plan or its assets).  The language of the

7    Recordkeeping Agreement between the Plan and the MFS affiliate only serves to

8    confirm this.    *See* Ex. A at 4-5 (stating that the recordkeeper is providing

9    "ministerial services" and that neither the recordkeeper nor its affiliates is a

10   "fiduciary" or "administrator" to the Plan or an entity that is "in possession or

11   control of 'plan assets'").

12       For each of the reasons stated above, all ERISA counts of the Complaint

13   should be dismissed.

14   **3.    Even If MFS Were a Fiduciary, It Did Not Breach any Duty
15        by Making Undisclosed Payments from Plan Assets,
            Because, on the Face of the Complaint, the Alleged
16        Payments Were Not from "Plan Assets"**

17       Even if MFS were a fiduciary to the Plan, it could not have breached its duty

18   in the way that Plaintiff claims because the payments that serve as the basis for all

19   of Plaintiff's ERISA claims were not made from Plan assets.    The Complaint

20   alleges that payments for which MFS was sued "were paid directly from money

21   invested in MFS funds, and were therefore, paid by the Plan participants, and,

22   therefore, from Plan assets." Compl. ¶ 32.    The Complaint then alleges that it was

23   both a breach of fiduciary duty and a prohibited transaction for MFS to use "plan

24   assets" in this manner. *See, e.g., id.* ¶ 70 ("Defendants knew or should have known

25   that those payments were the Plan's assets"); *see also id.* ¶¶ 32, 53, 58-60, 70, 76,

26   78.

27       The fundamental flaw with all of Plaintiff's claims, in this regard, is that the

28   *mutual fund assets* from which the Complaint alleges the relevant brokerage

1    commission payments were made, *see id.* ¶ 32, are as a matter of law *not* plan

2    assets.  ERISA Section 401 expressly states that when a plan invests in a mutual

3    fund, the plan assets include only its shares of the mutual fund, and not the mutual

4    fund's underlying portfolio holdings.    *See* ERISA § 401(b)(1); 29 U.S.C.

5    § 1101(b)(1).    As such, when MFS made decisions to direct brokerage

6    commissions as alleged in the Complaint, such decisions did not result in payments

7    from plan assets, but payments from the underlying mutual fund assets.  The

8    commissions were not paid out of the assets of any particular shareholder (such as

9    the Plan).  This alone requires dismissal of Plaintiff's Section 502(a) claims

10    (Counts I through III), as well as Plaintiff's Section 406 claims (Counts IV and V)

11    (which must be dismissed in any event because ERISA does not permit direct

12    claims under Section 406).[7]

13    **B.    ERISA Preempts The State Law Claims Under The California Business And Professions Code Section 17200 *et seq.***

14

15    Plaintiff's claims under California Business and Professions Code

16    Section 17200 *et seq.* ("Section 17200") fail as a matter of law because: (1) ERISA

17    preempts these claims; (2) this case involves the sale of securities and Section

18

19    [7] To the extent that Plaintiff claims it is not the alleged payments, but the alleged

20    undisclosed nature of the payments that serve as a basis to these claims, Plaintiff still does not state a claim because an investment adviser has no ERISA duty to disclose such payments, nor does the complaint allege such a duty.

21    ERISA sets forth certain specific reporting and disclosure obligations, *see, e.g.*,

22    ERISA §§ 101-11, 29 U.S.C. §§ 1021-31, but none of these provisions mandates disclosure of revenue sharing/ "directed brokerage" payments. *See, e.g., Deere &*

23    *Co.*, 496 F. Supp. 2d at 974 ("Whether, as a policy matter, additional reporting of revenue sharing arrangements should be required, it is not presently required and

24    failure to include such information does not violate existing ERISA standards for disclosure."); *Taylor v. United Technologies Corporation*, 2007 WL 2302284 (D.

25    Conn. Aug. 9, 2007) (dismissing a "breach of fiduciary claim based on non-disclosure of revenue sharing fees", ruling as a matter of law that ERISA does not

26    require such disclosure).  Thus, even if the Complaint sufficiently alleged that MFS were a fiduciary (and it does not) it would have no duty to disclose the

27    directed commission arrangements at issue here.

28

1  17200 does not apply to securities transactions; (3) these claims are barred under

2  the statute of limitations; and (4) Plaintiff does not have standing to bring Section

3  17200 claims.

       **1.**     **ERISA Preempts Claims Under State Consumer Protection And Unfair Business Practice Laws, Including Section 17200**

6       ERISA, as Plaintiff acknowledges, is "a comprehensive statute covering

7  virtually all aspects of employee benefit plans, including retirement savings plans."

8  Compl. ¶ 40. ERISA's "deliberately expansive" rights, regulations and remedies

9  "supersede any and all State laws insofar as they may now or hereafter relate to

10  any employee benefit plan." ERISA § 514(a), 29 U.S.C. § 1144(a); *Pilot Life*, 481

11  U.S. at 45-46. The breadth of ERISA preemption is well established in this

12  Circuit, which has held that ERISA broadly preempts state law causes of actions

13  that relate to an employee-benefits plan. *See, e.g., Cleghorn v. Blue Shield of

14  California.*, 408 F.3d 1222, 1225-26 (9th Cir. 2005) (holding that ERISA preempts

15  consumer protection and unfair business practice claims under California Civil

16  Code Section 17200 where the claims relate to an ERISA-regulated benefit plan).

17       In *Cleghorn*, the Ninth Circuit relied on the Supreme Count's decision in

18  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 221 (2004), which held that ERISA

19  preempts state causes of action, even where they are: (1) tort claims (unlike ERISA

20  claims); (2) based on an external state statutory duty; or (3) based on causes of

21  action that provide remedies not available under ERISA. *See* 408 F.3d at 1225.

22  "Congress' intent to make the ERISA civil enforcement mechanism exclusive

23  would be undermined if state causes of action that supplement the ERISA § 502(a)

24  remedies were permitted, even if the elements of the state cause of action did not

25  precisely duplicate the elements of an ERISA claim." *Id.* (citing *Aetna*, 542 U.S. at

26  216); *see also Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1147 (9th Cir.

27  2003) (action that seeks non-ERISA damages but relates to an employee benefits

28

1   plan "clearly falls under the § 1132 preemption"); *Dishman v. UNUM Life Ins. Co.*,

2   269 F.3d 974, 983 (9th Cir. 2001) ("claimants simply cannot obtain relief by

3   dressing up an ERISA benefit claim in the garb of a state law tort.").

4       Plaintiff's state law claims under California Code Section 17200 are

5   preempted by ERISA because they state a cause of action that arises from, and

6   directly relates to, the Plan.  Indeed, Count VI, which alleges that "Defendants

7   engaged in transactions *that were adverse to the Plan*" (Compl. ¶ 82) (emphasis

8   added), frankly acknowledges that "[t]he business practices alleged herein *are*

9   *unlawful under the Employment Retirement Income Security Act*, 29 U.S.C.

10   §§ 1132 (a)(2), (a)(3) for breaches of fiduciary duty, and 29 U.S.C. §§ 1106(a), (b)

11   for engaging in prohibited transactions". Compl. ¶ 82 (emphasis added).  Similarly,

12   Counts VII and VIII, which also allege counts under California Code Section

13   17200, state claims that relate to the Plan.  *See, e.g.*, Count VII, Compl. ¶ 87, and

14   Count VIII, Compl. ¶ 94 (both alleging that the defendants materially

15   misrepresented or failed to disclose facts to the Plan and engaged in transactions

16   adverse to the Plan).  Indeed, it would be hard to imagine allegations more directly

17   within the ambit of the civil remedies provided by ERISA Section 502, 28 U.S.C.

18   § 1132.

19       In light of settled Supreme Court precedent establishing the broad reach of

20   ERISA preemption, and the Ninth Circuit's specific application of that precedent

21   to claims such as these under the California Business and Professions Code

22   §§ 17200 *et seq.*, Counts VI through VIII are preempted by ERISA and should be

23   dismissed.

24       **2.    Section 17200 Does Not Apply to Securities Transactions**

25       Under California law, Section 17200 does not apply to securities

26   transactions. *See Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777, 790

27   (2004) (on an issue of first impression, holding the California Legislature did not

28   intend Section 17200, also known as California's "little FTC Act," to apply to

1    transactions in securities); *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal.

2    App. 4th 688, 715 (2007) (affirming *Bowen's* holding but differentiating the case

3    on factual grounds).   The *Bowen* court noted that "the FTC Act has never been

4    applied to securities transactions, and federal and state authority from 15 other

5    jurisdictions have held that their little FTC Acts do not apply to securities

6    transactions." *Bowen*, 116 Cal. App. 4th at 790.

7         In *Bowen*, the plaintiffs asserted they invested in certain securities based on

8    misstatements and misrepresentations made by defendants and that defendants

9    failed to disclose facts regarding the securities purchased.  *See id.* at 781.   The

10   Court held the plaintiff's Section 17200 claims failed as a matter of law because

11   Section 17200 does not apply to securities transactions.  *See id.* at 790.   Here, the

12   Plan alleges that Bullock, a "securities broker," made "recommendations as to the

13   purchasing and selling of securities" to the Plan and that the Plan purchased MFS

14   securities as a result of those recommendations  Compl. ¶¶ 7, 9, 10.  As in *Bowen*,

15   the Section 17200 claims fail as a matter of law because Section 17200 does not

16   apply to securities transactions.

17            **3.    Plaintiff's Section 17200 Claims are Barred by**
                      **the Statute of Limitations**
18

19        Counts VI, VII, and VII are subject to a four year statute of limitations.  *See*

20   California Business and Professions Code § 17208 ("Any action to enforce any

21   cause of action pursuant to this chapter shall be commenced within four years after

22   the cause of action accrued.").   Under California law, a cause of action accrues

23   when the last essential element occurs, even if the plaintiff is unaware of the cause

24   of action.  *See Karl Storz Endoscopy America, Inc. v. Surgical Technologies, Inc.*,

25   285 F.3d 848, 856 (9th Cir. 2002) (plaintiff's "claims under California Business

26   and Professions Code § 17200 *et seq.* were subject to a four-year statute of

27   limitations which began to run on the date the cause of action accrued, not on the

28   date of discovery."); *Snapp & Associates Ins. Services v. Malcolm Bruce*

18

1   *Burlingame Robertson*, 96 Cal. App. 4th 884, 891 (2002) (the statute of limitations

2   for a cause of action under Section 17200 accrues irrespective of whether the

3   plaintiff knew of its accrual); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 (1999)

4   ("The general rule for defining the accrual of a cause of action sets the date as the

5   time when the cause of action is complete with all of its elements.").

6           Plaintiff's claims are time-barred by this four year statute of limitations.

7   According to Plaintiff's Complaint, the directed brokerage agreements which give

8   rise to Plaintiff's Section 17200 claims (Counts VI, VII and VIII) were negotiated

9   and entered into in or about January 2002 and in January 2000. *See* Compl. ¶¶ 19,

10  32.  MFS suspended all of its directed commission practices in November 2003.

11  *Id.* ¶ 25.  Plaintiff did not bring this case until June 17, 2008, more than four years

12  past the date on which the practices ended.

13          Accordingly, all claims under Section 17200 must be dismissed with

14  prejudice. *See Sackett v. Beaman*, 399 F.2d 884, 892-93 (9th Cir. 1968).

15          **4.    Plaintiff Does Not Have Standing To Bring Their**
               **Section 17200 Claims**
16

17          California Business and Professions Code § 17204 states that, in order to

18  have standing to sue under Section 17200, a plaintiff must have suffered an "injury

19  in fact" and "lost money or property as a result of the unfair competition."  An

20  action must be dismissed where a plaintiff fails to meet this standing requirement.

21  *See, e.g., Animal Legal Defense Fund v. Mendes*, 160 Cal. App. 4th 136, 147

22  (2008) (dismissing plaintiffs' Section 17200 claim for lack of standing where

23  plaintiffs failed to establish monetary or property loss); *Hall v. Time, Inc.*, 158 Cal.

24  App. 4th 847, 855 (2008) (dismissing plaintiffs' Section 17200 claim where he

25  failed to establish monetary loss).

26          In *Animal Legal Defense Fund*, the plaintiffs alleged they would not have

27  purchased a particular brand of milk had they known it was produced by a

28  company which subjected its cows to illegal and inhumane conditions. *Animal*

1    *Legal Defense Fund*, 160 Cal. App. 4th at 146.  The court dismissed the plaintiffs'

2    Section 17200 claim for lack of standing because the plaintiffs failed to establish

3    any monetary or property loss as a result the defendants illegal actions, such as

4    paying a premium for the milk based or receiving an inferior product.  *Id.* at 145;

5    *see also Chavez v. Blue Sky Natural Beverage Co.*, 503 F. Supp. 2d 1370, 1373

6    (N.D. Cal 2007) (dismissing plaintiffs' Section 17200 claim where he failed to

7    establish he paid a premium for a beverage due to the alleged misleading

8    advertising).

9         Plaintiff has not alleged that it paid an increased price for MFS' mutual

10   funds or that MFS mutual funds were inferior to other mutual funds due to the

11   undisclosed compensation.  Without suffering any monetary or property loss, as in

12   *Animal Legal Defense Fund* and *Chavez*, Plaintiff does not have standing to assert

13   Section 17200 claims.

14   **IV.   CONCLUSION**

15        For the reasons set forth above, defendant MFS asks this Court to dismiss all

16   counts of the Complaint against it with prejudice.

17   DATED:  August 13, 2008

18
                                   By:  _____
19                                      Frances S. Cohen
20                                      Susan L. Hoffman
                                        Josephine Deang
21                                      Karen J. Pazzani

22                                      Attorneys for Defendant
                                        Massachusetts Financial Services
23                                      Company

24

25

26

27

28

# EXHIBIT A

## MFS RECORDKEEPER PLUS SERVICES AGREEMENT
## FOR THE I.A.T.S.E. LOCAL 33 SECTION 401(k) PLAN

### *INTRODUCTION*

This MFS Recordkeeper Plus Services Agreement for the I.A.T.S.E. Local 33 Section 401(k) Plan (the "Agreement") is entered into by the parties identified below as the Plan and the Recordkeeper. The purpose of this Agreement is to provide certain recordkeeping services offered by the Recordkeeper to the Plan and serviced by the Plan's Service Provider. The Service Provider has executed a separate agreement with the Recordkeeper identified as the MFS Recordkeeper Plus Master Services Agreement for the Service Provider (the "Service Provider Agreement").

### *DEFINITIONS*

**"Authorized Signer"** means any person designated by the Plan in the Plan Application or in subsequent written updates who is authorized to provide written Plan Instructions. Two persons will be designated as Authorized Signers by the Plan and two signatures are necessary to authorize all distributions from the Plan. The Recordkeeper may rely on one person to authorize any other transaction.

**"Code"** means the Internal Revenue Code of 1986, as amended, and regulations issued thereunder.

**"Employer"** shall have the same meaning in this Agreement as in section 1.19 of the Plan, as amended from time to time.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and regulations issued thereunder.

**"Individual Account"** means a separate account maintained on the TRAC system for each participant in the Plan invested in MFS Funds. All financial activity in each account is summarized on a participant statement to show transactions in shares, dollars and contribution type(s). Participants have access to account information and may initiate fund exchanges by telephone on the MFS Retirement Plan Information Line.

**"MFS Funds"** mean shares of the open-end investment companies for which MFS acts as investment adviser and units of the MFS Fixed Fund, an open-end collective investment trust.

**"Plan"** means the I.A.T.S.E. Local 33 Section 401(k) Plan which has been established under section 401(a) of the Code and has been described in the Plan Application.

- 1 -

"**Plan Administrator**" means the Board of Trustees appointed pursuant to the Plan to administer the Plan.

"**Plan Application**" means the Plan Application in the MFS Recordkeeper Plus Plan Establishment Kit which the Plan must complete to receive the Recordkeeper's approval for the Plan to use TRAC.

"**Plan Instructions**" mean such information, provisions, guidelines, interpretations and instructions (including information in the Plan Application) which are sent to the Recordkeeper by the Plan, the Service Provider, or the Plan's other agents in writing or in any electronic medium as the Recordkeeper may require to perform its services under this Agreement.

"**Recordkeeper**" means MFS Retirement Services, Inc. ("RSI"), a wholly owned subsidiary of Massachusetts Financial Services Company ("MFS"), and any assignee or successor of RSI.

"**Service Provider**" means the legal entity or person hired by the Plan to assist the Plan Administrator or other named fiduciaries designated in the Plan with the performance of their duties by furnishing administrative support services of a ministerial nature. Any reference in this Agreement to an agent or agents of the Plan or the Plan Administrator shall include the Service Provider. The Plan Administrator will function as the Service Provider under this Agreement during any period that another firm or person does not provide these support services or with the Recordkeeper's acceptance of the Plan performing such services.

"**Service Provider Application**" means the Service Provider Application in the MFS Recordkeeper Plus Service Provider Application Kit which must be approved by the Recordkeeper before the Service Provider has access to Plan and participant information stored on TRAC or to reports produced by TRAC.

"**TRAC**" means the TRAC 2000 Plan Administrative System developed for participant recordkeeping by DST Systems, Inc., and any successor administrative system employed by the Recordkeeper or its transfer agent affiliate to perform participant recordkeeping functions.

## *RECORDKEEPING SERVICES*

The Recordkeeper agrees to perform the electronic data processing and related ministerial services and functions specified in the attached Exhibit A, Recordkeeping Services, with respect to the Individual Accounts established by the Plan or its agents for the Plan's participants. These services shall be provided solely for Plan assets invested in MFS Funds. If the Plan has assets other than MFS Funds, the Recordkeeper shall not provide any services under this Agreement with respect to any such other assets. Recordkeeping services which are provided under this Agreement may be provided by affiliates of the Recordkeeper and, to the extent so provided, such affiliates shall have the full benefit of this Agreement.

**Exhibit A, page 22**

All information, data and other materials furnished to the Recordkeeper by the Plan, Plan Administrator or their agents must be in an electronic medium (such as diskettes, tapes or Internet transmissions) in a file format acceptable to the Recordkeeper. This requirement does not apply to requests for distributions, loans or certain other Plan Instructions which the Recordkeeper specifies must be in writing. The Plan, the Plan Administrator and their agents agree to use all necessary and appropriate security measures to safeguard the confidentiality of any information, data or other material transmitted to the Recordkeeper (including, without limitation, any transmissions over the Internet) and to comply with such requirements as may be established from time to time by the Recordkeeper.

## SERVICES NOT PROVIDED

The following services are specifically excluded from the recordkeeping services provided by the Recordkeeper:
1. Legal advice, tax advice or consulting services.
2. A prototype plan document for use by the Plan or the Service Provider.
3. Any compliance testing facilities of TRAC.

## SPECIAL SERVICES

The Plan may request that the Recordkeeper perform ministerial recordkeeping services in addition to those specified in Exhibit A. The Recordkeeper will provide only those additional services as may be agreed to by the Recordkeeper and the Plan in writing for a mutually agreed upon fee. Any other services (including, without limitation, transfer agent and shareholder servicing agent services) from time to time performed by the Recordkeeper or its transfer agent affiliate are not governed by the terms and conditions of this Agreement unless expressly specified herein.

## FEES

As compensation for its recordkeeping services under this Agreement, the Recordkeeper shall be entitled to fees which shall be computed in accordance with the attached Exhibit B, Fee Schedule, as amended from time to time.

### Annual Recordkeeping Fees
The annual recordkeeping fees shall be calculated by the Recordkeeper based on Plan years. The Recordkeeper will send statements to the Plan for annual recordkeeping fees semi-annually in arrears. The amounts billed are due within thirty (30) days of the billing date. The annual recordkeeping fees and billing dates are subject to change after September 30, 1999.

**Exhibit A, page 23**

The Plan may elect to pay the amounts billed as follows:

- **The Plan or the Plan Administrator may, by written Plan Instructions, cause the Plan to pay the amounts billed within thirty (30) days of the billing date.** Such written Plan Instructions are subject to the requirements and limitations which are imposed by the Recordkeeper in its automatic fee deduction service.

- **The Plan may itself pay the amounts billed within thirty (30) days of the billing date.**

## *PLAN REPRESENTATIONS AND RESPONSIBILITIES*

The Plan represents that: (1) it is authorized to enter into this Agreement on behalf of the Plan; (2) the Plan is qualified under Code section 401(a); (3) the Trust is tax-exempt under Code section 501(a); and (4) all Authorized Signers have capacity to act on behalf of the Plan.

The Plan shall promptly furnish Plan Instructions to the Recordkeeper as may be required by the Recordkeeper to perform its services under this Agreement. The Recordkeeper shall be fully protected in relying on Plan Instructions and shall have no responsibility to ascertain with respect to any Plan Instructions, their accuracy, genuineness, compliance with the terms of the Plan, any related documents or applicable law or their effect for tax purposes or otherwise. Plan Instructions must be sent to the Recordkeeper either in writing (an original and/or faxed copy of the original as required by the Recordkeeper) or in an electronic medium (such as diskettes or tapes) in a file format acceptable to the Recordkeeper. All written Plan Instructions shall be signed by an Authorized Signer. The Plan shall provide the Recordkeeper with a written update from time to time of all persons who are Authorized Signers. If the separate agreement between the Plan and the Service Provider is terminated for any reason, the Plan shall notify the Recordkeeper promptly and shall appoint a successor Service Provider within ninety (90) days after the agreement is terminated.

## *SERVICE PROVIDER RESPONSIBILITIES*

The Service Provider is responsible for providing certain stated administrative support services for the Plan to the Plan and/or Plan Administrator under a separate agreement. In order to implement such support services, the Plan hereby authorizes the Recordkeeper, subject to the Recordkeeper's approval of the Service Provider Application, to grant the Service Provider access to Plan and participant information stored on TRAC or to reports produced by TRAC. The Plan has authorized the Service Provider as its ministerial agent in a separate agreement and hereby directs the Recordkeeper to construe such directions or certifications as Plan Instructions. If the separate agreement between the Plan and the Service Provider is terminated for any reason, the Plan shall direct the Service Provider to transfer the Plan's records to a successor Service Provider selected by the Plan.

Exhibit A, page 24

## RECORDKEEPER RESPONSIBILITIES

The Plan acknowledges that the Recordkeeper is responsible only for the electronic data processing and related ministerial services specified in the attached Exhibit A, Recordkeeping Services, with respect to the Individual Accounts established in MFS Funds by the Plan or its agents for the Plan's participants. The Recordkeeper's responsibilities to provide withholding and tax reporting services are limited solely to those services set forth in the document "Recordkeeper Plus Plan Distribution Services," a copy of which the Plan acknowledges having received and read, and the Recordkeeper shall have no other obligations or duties with respect to any aspect of the administration or operation of the Plan. Nothing in this Agreement will be deemed to impose any obligation on the Recordkeeper to monitor, control or in any way exercise any powers or discretion in the handling of any Plan assets, including but not limited to disposition of any funds, securities or other assets under the Plan. All recordkeeping services performed by the Recordkeeper shall be as an independent contractor to the Plan and not as an employee or agent of the Plan, the Plan Administrator, their agents or any trustee or other named fiduciary. Neither the Recordkeeper nor any of its affiliates, nor any officer, director, employee or other agent of the Recordkeeper or any affiliate, shall have or be given any authority, control or responsibility that would render it, or otherwise cause it to be deemed to be, an "administrator" or other "fiduciary" of the Plan or to "handle" or be in possession or control of "plan assets" or "plan records," in each case within the meaning of ERISA, by reason of entering into or acting in accordance with this Agreement. The Recordkeeper is not responsible in any way for: (1) electronic transmissions sent over the Internet by the Plan, the Service Provider, the Recordkeeper, any trustee or other named fiduciary or their agents; (2) the acts or omissions of Internet service providers; (3) the malfunctions of Internet software, equipment, systems or services; or (4) breaches of confidentiality of Plan information and data which may occur when electronically transmitted over the Internet.

## LIMITATION OF LIABILITY

The Recordkeeper and its affiliates shall not be liable to the Plan, the Trustees, the Plan Administrator or any other person under this Agreement for loss, damage or liability, and shall be held harmless and indemnified therefrom, except to the extent such loss, damage or liability is caused by its negligence, bad faith, willful misconduct or violation of any duty under applicable law. This provision shall survive the termination of this Agreement.

## ACTS BEYOND THE CONTROL OF THE PLAN OR THE RECORDKEEPER

Neither the Plan nor Recordkeeper will be responsible for delays or failures in performances resulting from acts beyond its reasonable control. Such acts will include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations, power outages, fire, interruption or malfunction of communication facilities or equipment, earthquakes, other natural disasters, and extraordinary trading volume on any stock exchange which disrupts trading on the exchange.

Exhibit A, page 25

## CONFIDENTIALITY OF PLAN INFORMATION

The Recordkeeper agrees that all Plan information and data, including Plan Instructions, provided to the Recordkeeper by the Plan, the Plan Administrator, or their agents is the confidential information of the Plan. The Recordkeeper agrees not to disclose such confidential information to third parties (except to its affiliates or agents or in any administrative or judicial forum involving a dispute under this Agreement or as may be required by law or by order of any government agency, regulatory body, or court of competent jurisdiction) for purposes other than specified in this Agreement without the prior consent of the Plan or the Plan Administrator.

## AMENDMENT AND ASSIGNMENT

This Agreement may be amended or modified at any time: (1) by an instrument executed by the Plan and the Recordkeeper; or (2) by the Recordkeeper upon sixty (60) days written notice to the Plan, provided the Plan accepts the amendment by failure to object in writing in accordance with this paragraph. A written objection must be sent to the President of the Recordkeeper at the address provided under *Notices* and be received by the Recordkeeper within sixty (60) days after the amendment's mailing date. The Recordkeeper may, however, amend the document "Recordkeeper Plus Plan Distribution Services" without the Plan's consent upon thirty (30) days prior written notice to the Plan. This Agreement may not be assigned by either party without the prior express written consent of the other party, except that the Recordkeeper may assign its rights and obligations under this Agreement to any affiliate of the Recordkeeper or any successor in interest to the Recordkeeper upon thirty (30) days notice to the Plan.

## TERM OF AGREEMENT

The initial term of this Agreement will be for a period of three (3) years which will end on December 31, 2000. Thereafter, the Agreement will continue in effect and will be automatically renewed from Plan year to Plan year but may be terminated at any time with or without cause by the Plan or the Recordkeeper upon thirty (30) days written notice. The termination of the Service Provider Agreement shall not cause the termination of this Agreement.

If this Agreement is terminated by either the Plan or the Recordkeeper, the Recordkeeper will cease to perform the recordkeeping services described in Exhibit A, Recordkeeping Services, and will cease to maintain Individual Accounts on the TRAC system. Upon any termination of the Agreement, the Plan and the Plan Administrator hereby direct the Recordkeeper and its transfer agent affiliate to transfer all Individual Accounts maintained on the TRAC system into individual accounts registered in the name of the trustees of the Plan on the transfer agent system and to do so for each MFS Fund in which the Plan's participants invest. The Plan acknowledges that such individual participant accounts on the transfer agent system will not have certain benefits of the TRAC system, including, but not limited to, the benefits described in items 1 through 9 in Exhibit A. The Plan further acknowledges that the Plan Administrator is responsible for maintaining participant accounts under the Plan and that the Plan Administrator will assume such participant recordkeeping duties that are not performed on the transfer agent system when the

**Exhibit A, page 26**

transfer of Individual Accounts from the TRAC system to the transfer agent system is completed. Such transfer will occur no later than ninety (90) days after written notice of termination of services is given by either party, unless the Recordkeeper agrees to extend the deadline. In addition, the Plan agrees to select another recordkeeper within this ninety (90) day period unless the Recordkeeper agrees to extend the deadline.

## NOTICES

All notices to the Recordkeeper shall be addressed to the President, MFS Retirement Services, Inc., and sent by regular mail to P.O. Box 9274, Boston, MA, 02205-8541 or by express mail or delivery service to 500 Boylston Street, Boston, MA, 02116-3741 unless the Plan is otherwise notified in writing of any change. All notices to the Plan shall be sent to the address appearing on the Plan Application unless the Recordkeeper is otherwise notified in writing of any change.

## GENERAL TERMS

This Agreement supersedes all written and oral agreements, communications or negotiations between the parties and it constitutes the complete and full understanding and agreement of the parties with regard to the services to be provided pursuant to this Agreement (except as otherwise provided in an Addendum to this Agreement). None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person (other than the Plan and the Recordkeeper or its affiliates) including, without limitation, any Employer or any participant or any beneficiary covered by the Plan. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all counterparts, together, constitute only one Agreement. No waiver by any party of any failure or refusal to comply with an obligation hereunder shall be deemed a waiver of any other subsequent failure or refusal to so comply. This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the respective parties. If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby. Each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

*EFFECTIVE DATE*

This Agreement shall be effective as of October 1, 1997 (the date accepted by the Recordkeeper).

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

I.A.T.S.E. LOCAL 33 SECTION 401(k) PLAN

By: _____
      Thomas F. McAleer, IV
Title: _Co-Chairman of Board of Trustees_
Date: _____4/6/99_____

By: _____
      Bernard Cohan
Title: _Co-Chairman of Board of Trustees_
Date: _____4/12/99_____

MFS RETIREMENT SERVICES, INC., RECORDKEEPER

By: _____
      Martin E. Beaulieu
Title: _President_
Date: _____4/27/99_____

**Exhibit A, page 28**

## EXHIBIT A
## RECORDKEEPING SERVICES

The Recordkeeper will provide the following recordkeeping services under this Agreement:

1. Receive, process and store certain data on TRAC for Plan participants invested in MFS Funds.
2. Receive, process and allocate Plan contributions in accordance with Plan Instructions on TRAC at the participant level by contribution type (e.g., salary reduction, employer matching contribution, rollover, etc.) among MFS Funds.
3. Produce the following reports:
    - **Plan Level.** A **Transaction Activity Report** is produced to confirm in the aggregate any financial activity of Plan assets invested in MFS Funds. A **Plan Summary Report** is produced to summarize Plan assets and activities in MFS Funds after the end of each calendar quarter.[1]
    - **Participant Level.** A **Participant Statement** is produced to summarize all financial activity in an Individual Account after the end of each calendar quarter.[1]
    - Such other **reports** as may be periodically produced by the Recordkeeper to perform its services under the Agreements.[1]
4. Maintain the Plan's vesting schedules on TRAC.
5. Receive, process and store certain information with respect to loans to Plan participants.
6. Issue checks for distributions authorized by the Plan or Service Provider from Individual Accounts: (1) to the Plan's trustee(s) if withholding and tax reporting services are not provided by the Recordkeeper; or (2) to the Plan's participants if the Recordkeeper provides withholding and tax reporting services for MFS Funds. The Recordkeeper's responsibilities to provide withholding and tax reporting services are limited solely to those services set forth in the document "Recordkeeper Plus Plan Distribution Services."
7. Provide a toll-free telephone number for use by the Plan, Service Provider and Plan participants to contact the Recordkeeper. In addition, provide an automated voice response system for Plan participants to access their Individual Accounts.
8. Provide Plan participants electronic access to their Individual Accounts through the internet if authorized in writing by the Plan.
9. Automatically deduct certain Plan fees in accordance with the provisions of the Automatic Fee Deduction Reference Guide if authorized in writing by the Plan.

---

[1] Fiscal year end Plans may request reports on other than a calendar quarter in writing.

Exhibit A, page 29

<u>Exhibit B</u>

1998 Fee Schedule[1]

**Annual Recordkeeping Fees[2]**


Loan maintenance fee[3]                                     $12.50 annual loan fee


Distribution processing fee[4]                              $12.50 per distribution

---

[1] This Fee Schedule applies to the I.A.T.S.E. Local 33 Section 401(k) Plan.
[2] Annual Recordkeeping Fees have been waived for the I.A.T.S.E. Local 33 Section 401(k) Plan for the period which ends on September 30, 1999. Thereafter, the Plan and the Recordkeeper will agree in writing as to the applicable fees for recordkeeping services.
[3] Billed semi-annually  - on the last day of the second and fourth quarter - at $6.25 per loan.
[4] Federal and state income tax withholding on distributions are subject to certain restrictions. Please refer to the Recordkeeper Plus Plan Distribution Services for further details.

Exhibit A, page 30